IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DANIEL CLINTON ANDERSON, | ) | 2:06-CV-2843-JAM-KJM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | ORDER GRANTING DEFENDANT'S |
| | | MOTION FOR SUMMARY JUDGMENT[*] |
| | ) | |
| STATE FARM MUTUAL AUTOMOBILE | ) | |
| INSURANCE COMPANY; and DOES I | ) | |
| through X, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |

Defendant State Farm Mutual Automobile Insurance Company ("Defendant" or "State Farm") moves for summary judgment on Plaintiff Daniel Clinton Anderson's ("Plaintiff") claims for breach of the covenant of good faith and fair dealing, breach of an insurance contract, and punitive damages.  Plaintiff contends Defendant unreasonably withheld insurance benefits after Plaintiff was injured in an automobile accident.  For the following reasons, the motion is granted.

---

[*]    The case number has been altered to reflect the reassignment of this action to Judge John Mendez.

1

1 │ ///

2 │ I.  UNDISPUTED FACTS

3 │     The Court finds the following facts to be undisputed.

4 │ Plaintiff was involved in an automobile accident on July 27, 2000,

5 │ when the van in which Plaintiff was a passenger was approaching a toll

6 │ plaza.  (Pl.'s Response to Def.'s Statement of Undisputed Facts

7 │ ("SUF") ¶¶ 3-5.)  Plaintiff was not wearing a seatbelt.  (SUF ¶¶ 6-7.)

8 │ The accident occurred during Plaintiff's commute from San Francisco,

9 │ where he worked, to Sacramento, where he lived.  (Dep. of Daniel

10 │ Anderson, December 3, 2003 ("Pl. Dep.") at 40:9-13.)  At the time of

11 │ the accident, Plaintiff was insured by Defendant under an automobile

12 │ liability insurance policy which provided Plaintiff with Under-Insured

13 │ Motorist Coverage up to $100,000.  (Id. ¶¶ 1-2.)

14 │     Plaintiff lodged a claim with State Farm following the

15 │ accident.  (See Decl. of Kristi Love in Supp. of Def.'s Mot. for Summ.

16 │ J. ("Love Decl."), Ex. 24.)  He also quit his job in San Francisco and

17 │ began a new job in Sacramento on August 30, 2000.  (SUF ¶ 46; Pl. Dep.

18 │ at 11:17-19.)  From August 2000 to June 2002, Defendant and Plaintiff

19 │ corresponded regarding Plaintiff's claim.[1]  (SUF ¶¶ 48-66.)  Defendant

20 │ ────────────────

21 │     [1]   Defendant submitted as evidence letters from State Farm to
    │ Plaintiff and letters from Plaintiff's counsel to State Farm.  (See Love
22 │ Decl., Exs. 24-41.)  Plaintiff objects to the letters from State Farm to
    │ Plaintiff, arguing that Kristi Love ("Love"), the State Farm claim
23 │ representative who was responsible, in part, for handling Plaintiff's
    │ claim, is not able to authenticate the letters.  (See SUF ¶¶ 48-55, 58-
24 │ 61, 64, 66.)  The letters are attached to Love's declaration, but Love
    │ fails to declare the basis for her knowledge that these letters are
25 │ authentic.  (See Love Decl. ¶¶ 27-31, 36-39, 42, 44.)  Plaintiff argues
    │ Defendant has failed to make a "proper showing from Ms. Love in her
26 │ declaration that she has any knowledge with respect to the circumstances
    │ of the letter[s] . . . or [their] preparation."  (Id.)  On the same
27 │ grounds, Plaintiff also objects to one letter from his counsel to State
    │ Farm.  (See id. ¶ 50.)  Defendant counters that the letters are not
28 │                                                        (continued...)

continued to ask for updates regarding Plaintiff's claim and requested

a proposed settlement, but Plaintiff's counsel replied that he was

"not in a position to resolve this case at the present time since my

client is still receiving treatment for his injuries and has been

referred to a pain management specialist." (Love Decl., Exs. 31-32,

34-36.)  Plaintiff also notified Defendant that he had resolved an

action against the driver of the other vehicle for $15,000, and

requested "formal arbitration" of his insurance claim seeking benefits

pursuant to his under-insured motorist coverage. (Id., Exs. 32, 38,

40.)

        In July 2003, Defendant referred the matter to its counsel,

Crandall, Wade & Lowe ("CWL"). (Id., Ex. 45.)  CWL sent a preliminary

report to Defendant, stating:  "It would appear that this is a case of

liability on the part of the underinsured motorist.  However, we

believe that there may also be an issue of comparative fault since

[Plaintiff] was not wearing his seatbelt at the time of the accident

---

[1](...continued)

hearsay, but fails to address whether the letters are properly authenticated. (See Def.'s Reply to Pl.'s Response to Def.'s Statement of Undisputed Facts ("Def.'s Reply to SUF") at 2:4-3:20.) "[U]nauthenticated documents cannot be considered in a motion for summary judgment." Orr v. Bank of Am., NT & SA, 285 F.3d 764, 773 (9th Cir. 2002). However, documents may be authenticated based on "[a]ppearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances." Fed. R. Evid. 901(b)(4). The appearance, contents and substance of the letters indicate they are authentic. Further, Plaintiff presents no evidence that the letters are not authentic and does not attempt to prove they are fraudulent. See Alexander Dawson, Inc. v. NLRB, 586 F.2d 1300, 1302-03 (9th Cir. 1978) (holding it was not abuse of discretion to find documents were authenticated by their appearance, contents and substance, and the objecting party presented no evidence that the documents were not authentic and "did not attempt to prove the [documents] were fraudulently prepared"). Accordingly, Plaintiff's evidentiary objections to the letters from State Farm to Plaintiff and from Plaintiff's counsel to State Farm are overruled.

1 . . . ."[2]  (Id., Ex. 43.)  In November 2003, CWL sent a letter to

2 Defendant summarizing Plaintiff's claim, including Plaintiff's medical

3 treatment history, and recommending that Plaintiff's deposition be

4 taken.[3]  (Id., Ex. 44.)

5 　　　CWL took Plaintiff's deposition in December 2003.  (See

6 Decl. of Mark Swartz in Supp. of Pl.'s Opp'n to Def.'s Mot. ("Swartz

7 Decl."), Ex. 1.)  Plaintiff testified that while his injuries

8 initially affected the left side of his neck and left shoulder, with

9 time, his symptoms progressed down into his left arm and fingers.

10 (Pl. Dep. at 58:18-23.)  Plaintiff stated his symptoms had become

11 progressively worse, and he had first noticed the pain in his arms

12

13 　　　[2]　Plaintiff objects to Defendant's submission of the
14 correspondence between CWL and State Farm, arguing that these letters
contain hearsay and are not authenticated.  (See SUF ¶¶ 19-25, 28-39,
15 67-71.)  Many of the letters from CWL to State Farm contain information
CWL purportedly obtained from Plaintiff's medical records and
16 interrogatory responses.  (See Love Decl., Exs. 21-23, 42-45.)
Defendant contends that the letters are not hearsay "because they are
17 not offered to prove the truth of the matter asserted.  These statements
are offered to show State Farm's state of mind and the effect they had
18 on State Farm."  (Def.'s Reply to SUF at 2:12-16.)  Since the issue in
this action is whether Defendant unreasonably withheld insurance
19 benefits, these letters and the information they contain are relevant
for the non-hearsay purpose of demonstrating State Farm had received the
20 information.  Gibbs v. State Farm Mut. Ins. Co., 544 F.2d 423, 428 (9th
Cir. 1976) (holding district court did not err in admitting letters
21 containing hearsay sent to insurance company since the "letters were
admitted for the limited purpose of proving that [the company] and its
22 attorney had received this information . . . [and since] they were not
admitted to show the truth of matters asserted therein, they did not
23 contain hearsay").  Further, for the same reasons stated above, the
letters are sufficiently authenticated.  (See supra, n.1.)  Accordingly,
24 Plaintiff's evidentiary objections are overruled.
25
　　　[3]　Defendant submitted Plaintiff's medical records, but Plaintiff
26 objects to this evidence, arguing that it is not authenticated.  (See
SUF ¶¶ 23-25, 28-37.)  The records are attached to Love's declaration,
27 but Love fails to declare the basis for her knowledge that these records
are authentic.  (See Love Decl. ¶¶ 12-22.)  However, for the reasons
28 stated above, Plaintiff's objections are overruled.  (See supra, n.1.)

around June 2003.  (Id. at 59:1-5.)  He testified that his physician had informed him he needed to seek pain management and he was currently in the process of looking for a pain management specialist.  (Id. at 63:5-64:10.)  Plaintiff also testified that he took the new job in Sacramento "due to the accident, [since he] feared van pooling to San Francisco any longer." (Id. at 13:12-15.)  However, Plaintiff had applied for the new job in Sacramento before the accident, since it was "closer to home." (Id. at 14:3-10.)  Plaintiff also testified that he had not been wearing a seatbelt at the time of the accident because he "was getting hot in the van," so he unfastened his seatbelt in order to take off his jacket when the van "slowed up" at the toll plaza.  (Id. at 44:8-12.)

During February 2004, Plaintiff saw a neurologist, Dr. Ghoshal, who conducted an MRI.  (Swartz Decl., Exs. 2-4.)  The MRI revealed small disc bulging in Plaintiff's cervical spine without major neural impairment.  (Id., Ex. 4.)  Dr. Ghoshal recommended "formal pain management . . . with consideration of possible cervical epidural steroids." (Id.)  Plaintiff underwent cervical epidural steroid injections in March 2004, May 2004 and November 2004.  (Id., Exs. 5-7.)

In August 2004, Plaintiff underwent an independent medical examination by Dr. Baer Rambach, who was retained by Defendant pursuant to the insurance policy.  (SUF ¶ 74.)  Dr. Rambach sent a written report to Defendant after physically examining Plaintiff and reviewing Plaintiff's medical records.  (Love Decl., Ex. 48.)  Dr. Rambach opined that Plaintiff "did sustain a contusion to his scalp and head and apparent sprain/strains to the soft tissues of the cervical spine . . . ." (Id.)  Dr. Rambach also stated that further

medical tests should be conducted, and if those tests were negative, then he "would have nothing further to recommend for [Plaintiff] and it would be my opinion that he has obtained a state of maximum medical benefit." (Id.)  Dr. Rambach concluded that he "would not recommend referring [Plaintiff] to a chronic pain management facility on the basis of the information . . . obtained by reviewing his medical records and upon physical examination." (Id.)

Following review of Dr. Rambach's report, CWL sent Defendant a report in December 2004 that summarized the matter and concluded Plaintiff had slightly more than $5,000 in "recoverable medical specials" and his viable loss of earnings claim would be no more than $3,150. (Id., Ex. 46.)  CWL stated that Plaintiff contended he was forced to switch from his higher-paying job in San Francisco to the job in Sacramento due to the accident, which would entitle Plaintiff to more money in loss of earnings, but CWL expressed doubt as to the strength of this contention:  "Given that he lived in Sacramento, I have great difficulty believing that a trier of fact is going to believe that the reason why he took the job in Sacramento was a result of this accident." (Id.)  CWL also stated that Plaintiff had left a voicemail for a doctor four days before the accident saying that he had to cancel an upcoming appointment because he was starting a new job, thus indicating that he had decided to take the job in Sacramento before the accident. (Id.)

In February 2005, Plaintiff sent Defendant an offer to resolve his insurance claim with Defendant for $85,000, the difference between his $100,000 under-insured motorist coverage and the $15,000 which he had collected from the driver of the other vehicle. (See Swartz Decl., Ex. 8.)  In March 2005, Defendant rejected Plaintiff's

$85,000 offer and counter-offered $15,000.  (<u>Id.</u>, Ex. 11; SUF ¶ 84.)
Plaintiff rejected the $15,000 counter-offer.  (Swartz Decl., Ex. 13.)
Defendant subsequently made an "advance payment" of $15,000 to
Plaintiff in April 2005.  (<u>See</u> Love Decl., Ex. 52.)

In April 2005, Dr. Rambach prepared a second report based on
Plaintiff's supplemental medical records.  (SUF ¶ 77.)  In reviewing
these records, Dr. Rambach noted that Plaintiff "had pretty good pain
relief following the first epidural steroid injection and some relief
following the second epidural steroid injection."  (Love Decl., Ex.
49.)  Dr. Rambach also noted that Dr. Ghoshal had diagnosed Plaintiff
with "possible cervical radiculopathy."  (<u>Id.</u>)  However, Dr. Rambach
opined that "[f]rom reviewing the supplemental medical records there
is no information that would support the diagnosis of cervical
radiculopathy nor any ongoing treatment by a chronic pain management
specialist."  (<u>Id.</u>)

Also in April 2005, CWL sent a letter to State Farm advising
that under California law Plaintiff's failure to wear a seatbelt at
the time of the accident "cannot support a finding of negligence *per
se* for comparative fault purposes."  (Swartz Decl., Ex. 23.)  Instead,
the failure to use the seatbelt must have been unreasonable under the
circumstances.  (<u>Id.</u>)  CWL stated that the comparative fault issue
"could go either way."  (<u>Id.</u>)

In May 2005, Plaintiff informed Defendant by letter that Dr.
Hunt, Plaintiff's current pain management specialist, held the opinion
that Plaintiff would need cervical epidural injections every year for
the foreseeable future, which could total between $31,700 and $190,200
in total medical costs for the rest of Plaintiff's life (depending
upon on how many injections Plaintiff would receive each year).  (<u>Id.</u>,

Ex. 14.)  Plaintiff also reiterated his offer to settle for $85,000.
(Id.)

Defendant took the deposition of Dr. Hunt in July 2005.
(Swartz Decl., Ex. 15.)  Dr. Hunt testified that, in his opinion,
Plaintiff needed to continue with his medications, as well as undergo
intermittent physical therapy treatment and possibly some muscle
stimulation.  (Id., Ex. 15 at 23:14-22.)  He also testified that since
Plaintiff received good pain relief from cervical epidural steroid
injections, Plaintiff would need to undergo between two and four
injections every year for the rest of his life.  (Id. at 13-20, 27:1-
5.)

In August 2005, Defendant commissioned the report of a
biomechanic, Dr. Janet Jhoun ("Dr. Jhoun"), who assessed whether the
accident caused Plaintiff's injuries and whether those injuries would
have been mitigated if Plaintiff had been wearing a seatbelt.  (See
Love Decl., Ex. 55.)  Dr. Jhoun opined that "with reasonable
engineering certainty it is more likely than not that [Plaintiff]
would not have sustained a long lasting cervical injury if he were
properly seated wearing his seatbelt."  (Id.)

In October 2005, Defendant offered an additional $25,000 to
settle Plaintiff's claim.  (Swartz Decl., Ex. 16.)  Plaintiff rejected
this offer.  (SUF ¶ 87.)

Shortly before Plaintiff's claim was arbitrated, Dr. Rambach
prepared a third report after reviewing Dr. Hunt's deposition
testimony.  (Love Decl., Ex. 50.)  Dr. Rambach stated that he
disagreed with Dr. Hunt, who Dr. Rambach thought "appeared to be
chasing symptoms and basing his conclusions purely on [Plaintiff's]
subjective complaints."  (Id.)  Dr. Rambach opined that Dr. Hunt's

diagnosis of "facet arthropathy" was "purely speculative and not based on any specific normal objective findings." (Id., Ex. 50.)  Dr. Rambach stated that he "would strongly disagree with Dr. Hunt's opinion that [Plaintiff] will require epidural steroid injections indefinitely and probably for the remainder of his life . . . . [Plaintiff] should have attained a state of maximum medical benefit and should not be left with any permanent residuals." (Id.)

Love testified that at some point prior to the arbitration, CWL informed State Farm that CWL did not think State Farm would be able to use the seatbelt defense effectively in the arbitration. (Love Dep. at 99:8-11.)  Love testified that she disagreed with CWL because she "felt [the defense] could be effective." (Id. at 99:2-11.)

Plaintiff's claim was arbitrated in November 2005, pursuant to the insurance contract.[4]  On January 3, 2006, the arbitrator found Plaintiff had damages of $214,996.78.  (SUF ¶ 93.)  Ten days later, Defendant paid Plaintiff $70,000, the amount of the insurance policy minus the $15,000 paid by the third party driver and the $15,000 advance payment paid by Defendant.  (Id. ¶ 94.)

Plaintiff filed this action against Defendant alleging claims for breach of the covenant of good faith and fair dealing,

---

[4]   Defendant submitted the arbitrator's written award as evidence.  (See Love Decl., Ex. 5.)  Defendant contends the award shows that Defendant raised Plaintiff's failure to wear a seatbelt as a defense at the arbitration hearing.  (See SUF ¶ 12 (citing Love Decl., Ex. 5).)  Plaintiff objects to this evidence as hearsay.  (SUF ¶ 12.)  The arbitrator's written statement that Defendant raised the seatbelt defense is inadmissible hearsay if offered for its truth.  (See Fed. R. Evid. 801.)  Defendant counters that the statement is not offered for its truth, but rather for its effect on the hearer.  (Def.'s Reply to SUF at 2:12-16.)  However, the statement is only relevant if offered for its truth.  Therefore, the objection is sustained.

1 | breach of the insurance contract and negligence.  Plaintiff's
2 | negligence claim was subsequently dismissed.

3 | II.   OPINION

4 | A.  Legal Standard

5 | Federal Rule of Civil Procedure 56(c) provides that summary
6 | judgment "shall be entered forthwith if the pleadings, depositions,
7 | answers to interrogatories, and admissions on file, together with the
8 | affidavits, if any, show that there is no genuine issue as to any
9 | material fact and that the moving party is entitled to a judgment as a
10 | matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is "genuine"
11 | if it constitutes evidence with which "a reasonable jury could return
12 | a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc.,
13 | 477 U.S. 242, 248 (1986).  That genuine issue of fact is "material" if
14 | it "might effect the outcome of the suit under the governing law."
15 | Id.

16 | The moving party bears the initial burden of demonstrating
17 | the absence of a genuine issue of material fact.  See Celotex Corp. v.
18 | Catrett, 477 U.S. 317, 323 (1986).  If the moving party meets its
19 | burden, the burden then shifts to the non-moving party to go beyond
20 | the pleadings and by his or her own affidavits, or by the depositions,
21 | answers to interrogatories, and admissions on file, designate specific
22 | facts showing that there is a genuine issue for trial.  See id. at 324
23 | (citing Fed. R. Civ. P. 56(e)).  This burden requires more than a
24 | simple showing that there is some "metaphysical doubt as to the
25 | material facts."  Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio
26 | Corp., 475 U.S. 574, 586 (1986).  The mere existence of a scintilla of
27 | evidence is likewise insufficient to create a genuine factual dispute.
28 | Anderson, 477 U.S. at 252.  "Where the record taken as a whole could

1   not lead a rational trier of fact to find for the non-moving party,

2   there is no 'genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587.

3          On a motion for summary judgment, all reasonable doubt as to

4   the existence of a genuine issue of fact should be resolved against

5   the moving party. <u>Hector v. Wiens</u>, 533 F.2d 429, 432 (9th Cir. 1976).

6   The inferences drawn from the underlying facts must be viewed in the

7   light most favorable to the party opposing the motion. <u>Valadingham v.</u>

8   <u>Bojorquez</u>, 866 F.2d 1135, 1137 (9th Cir. 1989).  Where different

9   ultimate inferences may be drawn, summary judgment is inappropriate.

10  <u>Sankovich v. Ins. Co. of N. Am.</u>, 638 F.2d 136, 140 (9th Cir. 1981).

11  B.  <u>Breach of the Covenant of Good Faith and Fair Dealing</u>

12         Defendant seeks summary judgment on Plaintiff's breach of

13  the covenant of good faith and fair dealing claim, arguing it acted

14  reasonably as a matter of law when handling Plaintiff's claim.  (Mot.

15  at 18:1-23:14.)  Plaintiff argues Defendant breached the covenant of

16  good faith and fair dealing by unreasonably withholding insurance

17  benefits and failing to conduct a thorough investigation into his

18  claim.  (Opp'n at 17:5-21:25.)

19         "Every contract imposes on each party an implied duty of

20  good faith and fair dealing," which mandates that "neither party will

21  do anything which will injure the right of the other to receive the

22  benefits of the agreement." <u>Chateau Chamberay Homeowners Ass'n v.</u>

23  <u>Associated Int'l Ins. Co.</u>, 90 Cal. App. 4th 335, 345 (2001) (quotation

24  marks omitted); <u>Amadeo v. Principal Mut. Life Ins. Co.</u>, 290 F.3d 1152,

25  1158 (9th Cir. 2002).  Insurance contracts include the implied

26  covenant of good faith and fair dealing. <u>Century Surety Co. v.</u>

27  <u>Polisso</u>, 139 Cal. App. 4th 922, 948 (2006).

28

1          "In order to establish a breach of the implied covenant of

2   good faith and fair dealing under California law, a plaintiff must

3   show: (1) benefits due under the policy were withheld; and (2) the

4   reason for withholding benefits was unreasonable . . . ."  Guebara v.

5   Allstate Ins. Co., 237 F.3d 987, 992 (9th Cir. 2001).  "The key to a

6   bad faith claim is whether or not the insurer's denial of coverage was

7   reasonable."  Id.

8          "One of the ways an insurer can negate an insured's claim

9   that it has acted unreasonably or without proper cause is to

10  demonstrate the existence of a 'genuine dispute' regarding coverage or

11  the amount or extent of the insured's claimed loss."  Jordan v.

12  Allstate Ins. Co., 148 Cal. App. 4th 1062, 1072 (2007).  "A *genuine*

13  dispute exists only where the insurer's position is maintained in good

14  faith and on reasonable grounds."  Wilson v. 21st Century Ins. Co., 42

15  Cal. 4th 713, 723 (2007) (citations omitted) (emphasis in original).

16  "The 'genuine dispute' doctrine may be applied where the insurer

17  denies a claim based on the opinions of experts."  Fraley v. Allstate

18  Ins. Co., 81 Cal. App. 4th 1282, 1292 (2000).  However, reliance on an

19  expert "will not *automatically* insulate an insurer from a bad faith

20  claim based on a biased investigation."  Chateau Chamberay, 90 Cal.

21  App. 4th at 348 (emphasis in original).  Even when insurers rely on

22  experts, courts must deny summary judgment on bad faith claims when

23  evidence shows "the insurer dishonestly selected its experts[,] the

24  insurer's experts were unreasonable[,] [or] the insurer failed to

25  conduct a thorough investigation."  Id. at 348-49 (citations omitted).

26          "[A]n insurer is entitled to summary judgment based on a

27  genuine dispute over coverage or the value of the insured's claim only

28  where the summary judgment record demonstrates the absence of triable

issues as to whether the disputed position upon which the insurer

[relied] . . . was reached reasonably and in good faith." <u>Wilson</u>, 42

Cal. 4th at 724.

Defendant asserts that the undisputed facts show a genuine

dispute existed as to the amount of insurance benefits to which

Plaintiff was entitled under the policy.  (Mot. at 18:11-21:7.)  Dr.

Rambach had opined in three reports that Plaintiff had reached a state

of maximum health benefit, and would not require ongoing treatment by

a chronic pain management specialist.  (<u>See</u> Love Decl., Exs. 48-50.)

Dr. Rambach also specifically disagreed with Dr. Hunt's opinion that

Plaintiff would require cervical steroid injections for the rest of

his life.  (<u>See</u> <u>id.</u>, Ex. 50.)  CWL had informed Defendant that

Plaintiff's claim may be reduced by comparative negligence because

Plaintiff had not been wearing his seatbelt at the time of the

accident.  (<u>See</u> <u>id.</u>, Exs. 23, 45.)  Dr. Jhoun had opined that

Plaintiff's damages would have been minor had he been wearing a

seatbelt.  (<u>See</u> <u>id.</u>, Ex. 55.)  Finally, CWL had advised Defendant that

Plaintiff likely would be unable to prove that he had been forced to

take a lower-paying job in Sacramento due to the accident, thus

indicating Plaintiff's loss of earnings claim may be substantially

lower than Plaintiff contended.  (<u>See</u> <u>id.</u>, Ex. 46.)  Defendant argues

these circumstances created a genuine dispute, but Plaintiff counters

that Defendant's reliance on Dr. Rambach and the seatbelt defense was

unreasonable.

In evaluating the evidence to see if Defendant acted in bad

faith, "it is essential that no hindsight test be applied.  The

reasonable or unreasonable action by [Defendant] must be measured as

of the time it was confronted with the factual situation to which it

was called upon to respond." <u>Austero v. Nat'l Cas. Co.</u>, 84 Cal. App. 3d 1, 32 (1978). Plaintiff does not specify when, exactly, he contends Defendant should have paid him the full amount of benefits available under the policy. Since Plaintiff argues Defendant was unreasonable in relying on Dr. Rambach in light of Dr. Hunt's opinion and unreasonable in relying on the seatbelt defense in light of CWL's opinion, Plaintiff's argument appears to focus on the circumstances Defendant faced in November 2005, on the eve of arbitration. (<u>See</u> Opp'n at 17:5-21:25.) Plaintiff does not specifically argue that Defendant acted unreasonably prior to that time, and the evidence does not support such an argument. Plaintiff did not make a settlement offer until February 2005, although prior to that time Defendant had repeatedly asked Plaintiff to make a settlement offer. (Love Decl., Ex. 31, 34-36, 39; Swartz Decl., Ex. 8.) At the time of the February 2005 settlement offer, Defendant's position disputing Plaintiff's claim was based on Dr. Rambach's opinion, the seatbelt defense, and Plaintiff's likely inability to recover the extent of his asserted loss of earnings claim. When Plaintiff renewed his offer in May 2005, he based the offer on the opinion of Dr. Hunt. (<u>See</u> Swartz Decl., Ex. 14.) Defendant did not respond to Plaintiff's offer, but instead deposed Dr. Hunt and engaged Dr. Rambach to offer an opinion regarding Dr. Hunt's conclusions. Defendant's response was not unreasonable, since Defendant was entitled to investigate Plaintiff's claim. <u>Benton v. Allstate Ins. Co.</u>, 2001 WL 210685, at *7 (C.D. Cal. Feb. 26, 2001) (holding that an insurer is "entitled to withhold payment 'until it [can] find out on its own, to a measure of certainty' that the benefits claimed by plaintiff were actually owed") (quoting <u>Blake v. Aetna Life Ins. Co.</u>, 99 Cal. App. 3d 901, 921 (1979)). Therefore, the

14

discussion of whether Defendant reasonably disputed Plaintiff's claim for benefits focuses on whether, in November 2005, Defendant unreasonably withheld payment of the full amount available under the policy.

Plaintiff asserts that Defendant unreasonably relied on Dr. Rambach's opinion because Dr. Rambach "failed to consider any other possible physiological or anatomical explanation for [Plaintiff's] continuing pain complaints beyond bulging discs," and it was unreasonable for Defendant to rely on "conclusionary" opinions "from a doctor who only addressed bulging discs but none of [Plaintiff's] other pain complaints or their causes." (Opp'n at 18:1-3, 19:27.) Plaintiff does not cite to evidence in the summary judgment record showing a "possible physiological or anatomical explanation" that Dr. Rambach failed to address. In his April 2005 report, Dr. Rambach addressed Dr. Ghoshal's diagnosis of "possible cervical radiculopathy," concluding that "there is no information that would support the diagnosis of a cervical radiculopathy nor any ongoing treatment by a chronic pain management specialist." (Love Decl., Ex. 49.) In his November 2005 report, Dr. Rambach addressed Dr. Hunt's conclusions regarding the diagnosis of "facet arthropathy," and opined that this diagnosis was "purely speculative and not based on any specific normal objective findings." (Id., Ex. 50.) Therefore, the summary judgment record does not support Plaintiff's assertion that Dr. Rambach failed to consider other possible causes of Plaintiff's chronic neck pain. Instead, the record reveals a disagreement between experts, and Plaintiff has not presented any evidence in support of his argument that Defendant's decision to rely on its own expert was unreasonable under the circumstances. See Fraley, 81 Cal. App. 4th at

1293 ("Where the parties rely on expert opinions, even a substantial disparity in [opinions] . . . does not, by itself, suggest the insurer acted in bad faith."); <u>Maynard v. State Farm Mut. Auto. Ins. Co.</u>, 499 F. Supp. 2d 1154, 1156, 1162-63 (C.D. Cal. 2007) (holding genuine dispute existed where insurer relied on opinion of its doctor that plaintiff's injuries stemmed from a prior accident and pre-existing injuries, even though plaintiff's doctor opined that the second accident had "dramatically increased" the pain from the prior problems).

       Plaintiff also asserts that Defendant's reliance on the seatbelt comparative fault defense was unreasonable because CWL had informed Defendant that the defense does not apply if it was reasonable for Plaintiff to have unfastened his seatbelt. (Opp'n at 20:7-21:11.) Further, CWL had advised Defendant that CWL did not think the seatbelt defense would be effective in the arbitration. (Love Dep. at 99:8-11.) Defendant also knew the circumstances under which Plaintiff unfastened his seatbelt: he was warm and wished to remove his jacket, and the van was slowing as it approached the toll plaza. (<u>Id.</u> at 102:1-4.) However, this Court finds that it was not unreasonable for Defendant to believe that an arbitrator may have found Plaintiff's decision to unfasten his seatbelt under those circumstances was unreasonable, thus reducing Plaintiff's recoverable damages. <u>See Pan v. State Farm Mut. Auto. Ins. Co.</u>, 2007 WL 1674448, at *8 (N.D. Cal. June 8, 2007) (finding that insurer "reasonably disputed the amount of plaintiff's comparative fault" where plaintiff had been hit by a car while not in a crosswalk, and police officer had opined that plaintiff was at fault).

1          Plaintiff further argues Defendant did not thoroughly

2  investigate his claim.  (Opp'n at 18:15-20:6.)  "The genuine dispute

3  rule does not relieve an insurer from its obligation to thoroughly and

4  fairly investigate, process and evaluate the insured's claim."

5  <u>Wilson</u>, 42 Cal. 4th at 723.  Plaintiff contends Defendant's

6  investigation was not thorough because: (1) Plaintiff obtained a

7  medical opinion from an inappropriate medical specialist, as Dr.

8  Rambach was an orthopedic surgeon, not a pain management specialist

9  like Dr. Hunt; and (2) neither Love nor CWL called Dr. Rambach to ask

10 him "specifically what structures in [Plaintiff's] cervical spine

11 could be causing his chronic pain complaints or what injuries to

12 muscles could be playing a role in his chronic pain complaints."

13 (Opp'n at 18:15-20:6.)  However, the summary judgment record does not

14 support Plaintiff's contention.  Further, as discussed above,

15 Defendant's reliance on Dr. Rambach's opinion was not unreasonable.

16 This case is easily distinguishable from the case cited by Plaintiff,

17 <u>Wilson v. 21st Century Insurance Company</u>, 42 Cal. 4th 713 (2007).  In

18 <u>Wilson</u>, the court held that the insurer had failed to conduct a

19 thorough investigation where the insurer denied the plaintiff's claim

20 without speaking to the plaintiff's doctor or retaining it's own

21 doctor.  <u>See id.</u> at 722-23.  In this case, Defendant conducted a

22 thorough investigation by reviewing Plaintiff's medical records,

23 deposing Plaintiff's doctor, Dr. Hunt, and obtaining three reports

24 from an independent doctor, Dr. Rambach.

25          Considering all the information available to Defendant, the

26 only reasonable conclusion from the undisputed facts is that a genuine

27 dispute existed as to the amount of benefits to which Plaintiff was

28 entitled.  Accordingly, Defendant's summary judgment motion is granted

on Plaintiff's breach of the covenant of good faith and fair dealing claim.

C.   <u>Breach of Insurance Contract</u>

Defendant seeks summary judgment on Plaintiff's breach of insurance contract claim, arguing that it paid all benefits due under the policy following the arbitration.  (Mot. at 23:19-21.)  Plaintiff does not identify any damages stemming from the alleged breach of contract, and instead concedes that Defendant "eventually paid [Plaintiff] his benefits . . . ."  (Opp'n at 22:3.)  Plaintiff nevertheless argues that Defendant's "unreasonable failure to [pay benefits] in a timely manner is what is at issue" in his breach of contract claim, and therefore the claim "should not be stricken since is it bound with the bad faith cause of action."  (Opp'n at 22:3-5.)  Since Plaintiff concedes Defendant has paid the full amount available under the policy and summary judgment is granted on Plaintiff's breach of the covenant of good faith and fair dealing claim, Plaintiff's breach of contract claim is not viable.  <u>See</u> <u>Paulson v. State Farm Mut. Auto. Ins. Co.</u>, 867 F. Supp. 911, 917-18 (1994) (holding that an insured's breach of contract claim was "not viable [because the insurer] has paid [the insured] the limits of liability under his policy"); <u>Pan</u>, 2007 WL 1674448, at *5 (dismissing breach of contract claim where insurer had paid all of the policy benefits to which plaintiff was entitled under the policy).  Accordingly, summary judgment is granted on Plaintiff's breach of insurance contract claim.

D.   <u>Punitive Damages</u>

Defendant seeks summary judgment on Plaintiff's punitive damages claim.  (Mot. at 25:14-27:26.)  "[A] plaintiff who is not able to survive summary judgment on an insurance bad faith claim[] is also

18

1  unable to survive summary judgment on a related claim for punitive

2  damages." <u>Adams v. Allstate Ins. Co.</u>, 187 F. Supp. 2d 1219, 1231

3  (C.D. Cal. 2002).  Accordingly, Defendant's summary judgment motion is

4  granted on Plaintiff's punitive damages claim.

5                          III.  <u>ORDER</u>

6          For the foregoing reasons, Defendant's summary judgment

7  motion is GRANTED.  The Clerk shall enter a judgment in favor of

8  Defendant in accordance with this Order.

9          IT IS SO ORDERED.

10 DATED: June 13, 2008.

11                          _____
                            JOHN A. MENDEZ,
                            UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28